[No. D054212. Fourth Dist., Div. One. Nov. 23, 2009.]

LEON JAMES PAGE, Appellant, v.
MIRACOSTA COMMUNITY COLLEGE DISTRICT et al., Respondents.

COUNSEL

Ronald James Cozad for Appellant.

Jack M. Sleeth for Respondent MiraCosta Community College District.

Winet, Patrick & Weaver and Randall L. Winet for Respondent Victoria Munoz Richart.

## OPINION

**O'ROURKE, J.**—Appellant Leon James Page appeals from a judgment in favor of respondents MiraCosta Community College District (District) and Victoria Richart, District's former president and superintendent of MiraCosta Community College (the college). Page filed a multicount petition for writ of mandate challenging the District Board of Trustees's actions in approving a settlement between Richart and District, contending in part that District violated the Ralph M. Brown Act (Gov. Code, § 54950.5 et seq.[1]; the Brown Act or Act), made an unconstitutional gift (Cal. Const., art. XVI, § 6) and also illegally expended and wasted public funds (Code Civ. Proc., § 526a) by authorizing a settlement in violation of sections 53260 and 53261. The trial court sustained respondents' demurrers to one of Page's Brown Act causes of action, and on the parties' cross-motions for summary judgment/adjudication, denied Page's motion and granted summary judgment in District and Richart's favor on Page's remaining causes of action.

On appeal, Page contends (1) the trial court erred in its interpretation of sections 53260 and 53261, which limit the "maximum cash settlement" in contract termination cases; (2) for purposes of his causes of action for waste of public funds and unjust enrichment, the court misapplied the law and ignored admissible evidence raising triable issues of material fact as to whether District settled in good faith with Richart; and (3) the court erred by sustaining the demurrers to his second cause of action for violation of the Brown Act.

We conclude Page was entitled to summary adjudication of his fourth and sixth causes of action on grounds District's payments to Richart in connection with the termination of her contract exceed the cash and noncash limitations contained in sections 53260 and 53261. As a result, respondents are not entitled to summary judgment on their fifth cause of action alleging an unconstitutional gift of public funds. We further conclude the trial court

---

[1] All statutory references are to the Government Code unless otherwise indicated.

should have overruled respondents' demurrers to Page's second cause of action for violation of section 54956.9. We reverse the judgment and remand the matter with directions set forth below.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

Page is a taxpayer and a resident of District, which is governed by a publicly elected seven-member board of trustees (Board). The Board acts as a unit, and trustees have no individual authority to make District policy or unilaterally take District action.

In 2004, District hired Richart as the superintendent and president of the college. She received high ratings in 2005 and 2006 performance evaluations. In July 2006, District renewed Richart's employment for an additional four-year term, from July 1, 2006, to June 20, 2010. Her employment agreement provided for an annual salary of approximately $227,200 with specified increases, health insurance, and other benefits. Her employment agreement also contained a provision mandated under section 53260 detailing the maximum cash settlement she "may" receive "if this Employment Agreement is terminated . . . ."[3]

In the summer of 2006, in response to a whistleblower's report, Richart initiated an investigation of alleged financial mismanagement within the college's horticulture department. She reported the matter to the district attorney, and the employee responsible for the day-to-day operations of that department was eventually charged with and pleaded guilty to fraud. At the

---

[2] We state the background facts from the undisputed material facts set out in the parties' separate statements and other unchallenged evidence presented in their cross-motions for summary judgment/summary adjudication. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 767–768 [107 Cal.Rptr.2d 617, 23 P.3d 1143]; *Cotta v. City and County of San Francisco* (2007) 157 Cal.App.4th 1550, 1553, fn. 2 [69 Cal.Rptr.3d 612]; *Alexander v. Codemasters Group Limited* (2002) 104 Cal.App.4th 129, 139 [127 Cal.Rptr.2d 145].) We are compelled to note that many of the purported disputes set forth in Page's responsive separate statements are premised on arguments or characterizations about the legal sufficiency of facts and documents, even when respondents repeat almost verbatim allegations from Page's verified writ petition. To the extent disputes are premised on such argumentative statements or statements that go beyond the assertedly undisputed fact, they are ineffective to create triable issues.

[3] The clause in Richart's employment contract states: "As required by Government Code section 53260, if this Employment Agreement is terminated, the maximum cash settlement that the Superintendent/President may receive shall be an amount equal to her monthly salary multiplied by the months left on the unexpired term of the Employment Agreement, or 18 months, whichever is less. Any such cash settlement shall not include other fringe benefits or non-cash items, except for health benefits. Health benefits may be continued for (1) the number of months left on the unexpired term of the Employment Agreement or 18 months, whichever is less, or (2) until the Superintendent/President finds other employment, whichever occurs first."

end of November 2006, a secret vote by some college faculty members unhappy with Richart's actions resulted in a resolution of no confidence against her.

By early 2007, the investigation and Richart's role in it had become increasingly controversial, resulting in complaints by the academic senate's president and council about Richart's general leadership. The Board's president, however, issued a letter indicating the Board's support for Richart. Large numbers of college employees began attending Board meetings to complain about the report and Richart's investigation. On February 1, 2007, three trustees, Gloria Carranza, Jackie Simon and Judy Stratton, issued a "minority response" that addressed and criticized the Board's responses to various concerns raised by the academic senate, in part accusing the Board majority of ignoring those and other faculty member concerns.

Richart met the next day with Board president Charles Adams, former Board president Rudy Fernandez and District's general counsel to discuss the minority report and prepare a letter regarding the minority trustees' comments. In her February 2, 2007 letter, Richart expressed her belief that the minority response was a public negative evaluation that undermined her office and the Board's ability to work together for the good of the college, and constituted a violation of her due process rights. She expressed her belief that it might be in her best interest to publicly reveal past misconduct at the college that had occurred before her arrival. At the same time, Board president Adams wrote to the trustees stating that the minority trustees had violated Richart's due process and privacy rights, and informing them that opinions about Richart's performance had to be disclosed in closed session where it was on the agenda for evaluations. He instructed the trustees not to make any public evaluation statements about Richart.

Later that month, during a public hearing, trustee Stratton read out loud portions of Richart's February 2, 2007 letter. She spoke negatively about Richart's letter and its content, and berated her in public. Trustee Carranza also spoke about Richart, reporting information from another letter Richart wrote to the Board in October 2006 and expressing "fear and intimidation" as a result of Richart's February 2007 letter. Carranza stated she felt Richart's letter "was threatening a public official . . . ." Another Board member responded that the minority trustees' actions in evaluating Richart in public and sending their response to the college's academic senate were legally improper and put the District at grave litigation risk. Following the hearing, trustee Stratton provided Richart's October 2006 and February 2007 letters to the attorney for the academic senate president.

Eventually, Richart retained Attorney Robert Ottilie to evaluate her claims against the individual trustees. District's vice-president of business and administrative services, Jim Austin, met on at least two occasions with District's claims adjuster, who indicated she believed Richart's claims presented a significant threat of litigation to District. The adjuster appointed legal counsel and agreed to mediate the dispute in front of retired Superior Court Judge David Moon. On June 8, 2007, Richart and Ottilie met with Austin, District's general counsel, and retired Judge Moon to present the facts of her claims. Based on his meetings, the discussions with Judge Moon and the claims adjuster's analysis, Austin believed there was a substantial threat of litigation and risk of liability to District if Richart were to proceed with litigation. He recommended that the matter be set for the Board's consideration at a closed session.

On June 14, 2007, Attorney Ottilie sent a letter to District's legal counsel proposing that they discuss resolution of claims Richart believed she possessed arising from the trustees' individual and collective conduct.[4] Thereafter the Board issued a meeting agenda for June 19, 2007, announcing that a special Board meeting/closed session would be held by the Board under the following notice: "Conference with Legal Counsel—Anticipated Litigation: Significant exposure to litigation pursuant to subdivision (b) of Section 54956.9: One case."

On June 19, 2007, the Board adjourned to a closed session, during which the Board and Richart, with the assistance of Judge Moon, reached a settlement in which Richart agreed to step down as president and serve as a consultant for the next 18 months. Judge Moon never entered the boardroom; groups of Board members in numbers less than a quorum left the room to meet with Judge Moon. The settlement agreement was drafted by District's counsel and signed by each trustee, including the minority trustees. In part the settlement and release agreement states: "A dispute has occurred between the parties regarding Richart's employment with the college. Richart through her legal counsel filed a letter to explore and/or resolve claims. . . . The parties wish to settle their dispute." Under the agreement, District would for 18 months pay Richart her monthly salary at her contract rate as well as "step and CPI increases," "existing expenses" of $3,150 per month, health benefits, and contributions to the state retirement system. The agreement also required District to pay Richart $43,500 in personal attorney fees "incurred to date related to her employment and potential claims against the COLLEGE," and

---

[4] In full, Ottilie's letter states: "This office has been retained by Victoria Richart to explore and/or resolve claims she may have arising from the conduct of individual trustees and the trustees of MiraCosta College. Ms. Richart believes it would be in the best interests of the college if we could discuss a potential resolution of these claims. She would like to do so immediately at the very earliest opportunity that the board can gather in closed session to discuss these potential actions. [¶] Please advise at your earliest opportunity. Thank you."

$650,000 "for damages" upon the agreement's execution. In exchange, Richart agreed to "step down" on June 30, 2007. The agreement includes a mutual general release of all claims, as well as a Civil Code section 1542 waiver.

Thereafter, Page wrote District, maintaining the settlement violated the Brown Act and demanding that it cure the violations. District denied committing any Brown Act violation. However, it eventually noticed and placed on its agenda another hearing pertaining to Richart's pending litigation. Ottilie then provided District with a letter explaining Richart's position as to the issues, and damages she claimed to have sustained. On August 21, 2007, the Board was presented with and approved the settlement between District and Richart.

Page filed a petition for writ of mandate, setting out causes of action against District for violation of the Brown Act (first, second and third causes of action), illegal expenditure of public funds (fourth cause of action), and waste and/or unconstitutional gift of public funds (fifth cause of action). He asserted a sixth cause of action for unjust enrichment against Richart. In his second cause of action, Page alleged that section 54956.9 of the Brown Act did not authorize a legislative body to engage in mediation with a person not associated with that body in closed session, and that the Board had no statutory authority to negotiate with Richart, mediate or otherwise confer with Judge Moon on June 19 and 20, 2007, thus violating the closed session exception to the Brown Act. Among other relief, he sought a judicial declaration that the Board's June 19, 2007 actions and Richart's settlement agreement were null and void, and that the monetary and nonmonetary benefits granted to Richart were an impermissible gift and waste of public funds. He also sought to compel the Board to cure its failure to notify the public of its intent to mediate Richart's dispute by Judge Moon, compel the Board to audiotape all future business, enjoin the District from performing under the settlement agreement, and compel Richart to return all benefits to the District.

District and Richart both generally demurred to the petition on grounds each claim failed to state facts constituting a claim on which relief could be granted. Citing *Southern California Edison Co. v. Peevey* (2003) 31 Cal.4th 781 [3 Cal.Rptr.3d 703, 74 P.3d 795] (*Peevey*), the trial court sustained without leave to amend the demurrers to Page's second cause of action, ruling, "The Board can properly deliberate and vote on a proposed settlement in closed session." It overruled the remaining demurrers.

Thereafter, the parties filed cross-motions for summary judgment and/or summary adjudication.[5] In his motion, Page argued Richart's severance package was excessive and illegal under sections 53260 and 53261 in that her severance called for a nearly $1.2 million gift in excess of the maximum cash settlement formula of section 53260. He argued the statutes' legislative history, as well as evidence from the bill's author, then Senator Gary Hart, made it clear the Legislature was concerned about "windfall" buyouts of school district employee contracts, as reflected by the examples referenced in the legislative record, including an instance where a school district superintendent in connection with his early retirement obtained a large sum of money for "personal injuries and sickness" in addition to wages and compensation. Page maintained that application of the statute to Richart's written severance package was a pure question of law.

Characterizing Page's motion as applying only to his fourth and sixth causes of action for illegal expenditure of public funds and unjust enrichment, the trial court denied it, ruling as a matter of law that section 53260 clearly and unambiguously applied only to the maximum amount of a cash settlement an employee "may" receive for claims arising out of contract termination, and did not prohibit payment of settlement amounts on a tort claim. It ruled, "Nothing in this statute prohibits payment of settlement amounts on a tort claim" and Page "did not establish that the monies to be paid to Richart under the settlement agreement were paid in connection with the termination of her employment and not her tort claim."

The court then granted District's and Richart's motions for summary judgment. As to the fourth cause of action, it ruled Richart's settlement did not violate section 53260. As to the fifth and sixth causes of action, the court ruled respondents met their initial burden of proof showing the settlement was made in good faith, and Page failed to raise triable issues of material fact on that point; it found it had no authority to "look behind the settlement and determine whether Richart had a legitimate tort claim."

The court entered judgment denying Page's writ petition. Page filed this appeal.

---

[5] Page styled his motion as one for summary judgment, although the motion was based only on counts four and six. The trial court correctly treated the motion as one for summary adjudication of issues (Code Civ. Proc., § 437c, subd. (f)(1)). On appeal, Page does not challenge the trial court's ruling with respect to his first and third causes of action alleging Brown Act violations, and we do not address those claims.

## DISCUSSION

### I. *Summary Judgment*

#### A. *Standard of Review*

We determine this appeal in accordance with the customary rules of appellate review following summary judgment, reviewing the matter de novo. (*Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1348 [1 Cal.Rptr.3d 32, 71 P.3d 296]; *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843–857 [107 Cal.Rptr.2d 841, 24 P.3d 493]; *Hayward Area Planning Assn. v. Alameda County Transportation Authority* (1999) 72 Cal.App.4th 95, 104 [84 Cal.Rptr.2d 744] [on appeal of summary judgment, construction of statute at issue in petition is reviewed de novo].) The general rule is, of course, that summary judgment is appropriate where "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. . . ." (Code Civ. Proc., § 437c, subd. (c).) We consider "all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 [100 Cal.Rptr.2d 352, 8 P.3d 1089].)

In doing so, we strictly construe the moving party's evidence and resolve doubts as to the existence of triable issues in favor of the party opposing summary judgment. (*Gafcon, Inc. v. Ponsor & Associates* (2002) 98 Cal.App.4th 1388, 1402 [120 Cal.Rptr.2d 392]; *Woodridge Escondido Property Owners Assn. v. Nielsen* (2005) 130 Cal.App.4th 559, 567–568 [30 Cal.Rptr.3d 15].) We do not decide the merits, but only determine if there is evidence requiring the fact-weighing procedures of a trial. (*Connelly v. County of Fresno* (2006) 146 Cal.App.4th 29, 36 [52 Cal.Rptr.3d 720].)

Relying on cases involving review of a local entity's quasi-legislative decision, District argues our review of this matter is limited to whether Page can demonstrate the challenged action was arbitrary, capricious, or entirely lacking in evidentiary support. As Page points out, District's cited authority does not involve summary judgment review. Further, we are not convinced the Board's approval of Richart's settlement (or any of its other challenged conduct) is quasi-legislative. (See *Ohton v. Board of Trustees of California State University* (2007) 148 Cal.App.4th 749, 766 [56 Cal.Rptr.3d 111] (*Ohton*) [distinguishing between quasi-legislative and quasi-adjudicatory actions; a legislative action is the formulation of a rule to be applied to all

future cases, while an adjudicatory act involves the actual application of such a rule to a specific set of existing facts].) Even assuming, without deciding, that the challenged conduct is quasi-legislative, such decisions are also reviewed under the test of whether the agency's decision is " 'contrary to established public policy or unlawful or procedurally unfair.' " (*Mike Moore's 24-Hour Towing v. City of San Diego* (1996) 45 Cal.App.4th 1294, 1303 [53 Cal.Rptr.2d 355]; see also *Ohton*, at p. 766 [in ordinary writ case, court reviews for abuse of discretion, which will occur where action " 'transgresses the confines of the applicable principles of law . . .' " or if action " 'failed to conform to procedures required by law' "].) Under this test, we review de novo the legality of District and Richart's settlement as well as the Board's approval of that settlement.

### B. *Illegal Expenditure of Public Funds/Unjust Enrichment (Fourth and Sixth Causes of Action)*

The question presented by the parties' cross-motions is whether Richart's settlement with District, the terms of which are undisputed, is unlawful under section 53260 and its "maximum cash settlement" formula. The parties do not dispute that the total payments to Richart under the settlement agreement exceed that formula. Resolution of the question turns on the interpretation of sections 53260 and 53261. "Issues of statutory construction as well as the application of that construction to a particular set of facts are questions of law." (*Coburn v. Sievert* (2005) 133 Cal.App.4th 1483, 1492 [35 Cal.Rptr.3d 596].)

#### 1. *Principles of Statutory Interpretation*

■ We review questions of statutory interpretation "seeking, as always, to ascertain the Legislature's intent so as to give effect to the law's purpose." (*In re Corrine W.* (2009) 45 Cal.4th 522, 529 [87 Cal.Rptr.3d 691, 198 P.3d 1102]; see *Elsner v. Uveges* (2004) 34 Cal.4th 915, 927 [22 Cal.Rptr.3d 530, 102 P.3d 915].) "We begin with the statute's plain language, as the words the Legislature chose to enact are the most reliable indicator of its intent. [Citation.] But if 'the text alone does not establish the Legislature's intent clearly, we must turn to other sources for insight . . . .' " (*In re Corrine W.*, at p. 529.) If "statutory text is susceptible of more than one reasonable interpretation, we will consider ' "a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part." ' " (*Elsner v. Uveges*, at

p. 929; see *Hughes v. Board of Architectural Examiners* (1998) 17 Cal.4th 763, 775–776 [72 Cal.Rptr.2d 624, 952 P.2d 641].) "Ultimately we choose the construction that comports most closely with the apparent intent of the lawmakers, with a view to promoting rather than defeating the general purpose of the statute." (*Allen v. Sully-Miller Contracting Co.* (2002) 28 Cal.4th 222, 227 [120 Cal.Rptr.2d 795, 47 P.3d 639].)

### 2. Government Code Sections 53260 and 53261—Statutory Language

■ Section 53260, which is contained in article 3.5 of title 5, division 2, part 1, chapter 2, relating to local agency government officers and employees, allows payment of no more than 18 months of pay and specified benefits upon termination of an employment contract for years. (See *Lucas v. Santa Maria Public Airport Dist.* (1995) 39 Cal.App.4th 1017, 1023–1024 [46 Cal.Rptr.2d 177].) There is no dispute that District is a local agency within the meaning of the statute. (§ 53263 [defining a local agency as including a "community college district" for purposes of that article].)

Subdivision (a) of section 53260 provides: "All contracts of employment between an employee and a local agency employer shall include a provision which provides that regardless of the term of the contract, if the contract is terminated, the maximum cash settlement that an employee may receive shall be an amount equal to the monthly salary of the employee multiplied by the number of months left on the unexpired term of the contract. However, if the unexpired term of the contract is greater than 18 months, the maximum cash settlement shall be an amount equal to the monthly salary of the employee multiplied by 18." The statute contains a different formula—not applicable here—that applies in the event the employer confirms a superintendent has engaged in fraud, misappropriation of public funds or other illegal fiscal practices. (§ 53260, subd. (b)(1).)[6]

Subdivision (c) of section 53260 provides: "The cash settlement formula described in subdivisions (a) and (b) are maximum ceiling [*sic*] on the amounts that may be paid by a local agency employer to an employee and is not a target or example of the amount of the cash settlement to be paid by a local agency employer to an employee in all contract termination cases."

---

[6] Section 53260, subdivision (b) provides: "(1) Notwithstanding subdivision (a), if a local agency employer, including an administrator appointed by the Superintendent, terminates its contract of employment with its district superintendent of schools that local agency employer may not provide a cash or noncash settlement to its superintendent in an amount greater than the superintendent's monthly salary multiplied by zero to six if the local agency employer believes, and subsequently confirms, pursuant to an independent audit, that the superintendent has engaged in fraud, misappropriation of funds, or other illegal fiscal practices. The amount of the cash settlement described in this paragraph shall be determined by an administrative law judge after a hearing. [¶] (2) This subdivision applies only to a contract for employment negotiated on or after the effective date of the act that added this subdivision."

The following provision, section 53261, provides: "The cash settlement specified in Section 53260 shall not include any other noncash items except health benefits, which may be continued for the same duration of time as covered in the settlement, pursuant to the same time limitations as provided in Section 53260, or until the employee finds other employment, whichever occurs first."

### 3. *Analysis*

Page contends that when read together, sections 53260 and 53261 mean that when a governing board decides to terminate a public employee's employment, it may either terminate the employment without an agreement, forcing the employee to test the legality of the decision in court, or it may elect to settle the contract and negotiate a cash settlement limited by sections 53260 and 53261. He concedes the monetary limitations in those sections apply only to public monies spent to settle a contested termination of employment and that nothing prevents the local agency from separately settling unrelated claims independent of the employee's continued employment, as long as the settlement is within a separate agreement accompanied by claims filed under the Government Tort Claims Act (§ 810 et seq.). Pointing out Richart and District's settlement agreement expressly conditions Richart's resignation on her receipt of specified payments that exceed the "maximum cash settlement" formula in section 53260, and that Richart did not otherwise comply with the Government Tort Claims Act, Page maintains the settlement constitutes an illegal expenditure of public funds and is void under Civil Code section 1667.[7]

District and Richart both argue, as they did in moving for summary judgment below, that the effect of the statute is unambiguous: that the Legislature's references to the "contract" and use of the phrase "contract termination cases" (§ 53260, subd. (c)) mean the payment limitations apply only to settlements "on the 'contract' " in exchange for a public employee's waiver of contract rights, and not to the settlement of tort claims such as Richart's. They argue any other interpretation would lead to absurd or

---

[7] Page points specifically to paragraph 2.10 of the settlement agreement, which provides: "In consideration for the foregoing, and only upon both the execution of this Agreement and payment of the monetary sums payable under Sections 2.2 [purchase of retirement service credit], 2.4 [payment of $650,000 in damages], 2.5 [payment of $43,500 in personal attorney fees] and 2.6 [payment of mediation fees of Judge Moon], Richart will step down as Superintendent/President on June 30, 2007. If payments under Sections 2.2, 2.4, 2.5 and 2.6 are not made by June 30, 2007, Richart shall remain as Superintendent/President until those payments are made." Page asserts this is an exchange of promises bringing the agreement within the scope of sections 53260 and 53261. He also points to Richart's conduct after June 20, 2007, namely the fact she remained District's superintendent/president because the service retirement credit promised to her had not yet been purchased.

unworkable results, in that such interpretation would prohibit settlements of large "legitimate" racial discrimination or other significant tort claims.

Page challenges respondents' interpretation as impermissibly adding words to the statute. He asserts use of the phrase "maximum cash settlement" does not mean " 'partial cash settlement for some but not all potential claims' or 'partial cash settlement for contract claims only.' " Page argues that public employment is statutory and thus Richart did not have "contract rights" to waive and release.[8] He points to a newspaper press release contained within the legislative files reporting the "early retirement" of the Santa Maria-Bonita School District's superintendent and his receipt of $245,000 from the district in exchange for a release alluding to " 'differences' " that " 'caused [the superintendent] to suffer personal injuries and sickness.' " The payment included $167,000 for the superintendent's personal injuries and sickness and reimbursement of his attorney fees, in addition to $78,000 in wages and compensation. Page contends the statutes' legislative history—which the trial court did not consider—demonstrates the Legislature's intent was to limit the excessive buyouts of highly paid government employees under contract, which were being "featherbedd[ed] . . . by injecting amorphous and undocumented potential claims" as for personal injury and sickness.

■ Applying plain and commonsense meaning to the statute's words (*Flannery v. Prentice* (2001) 26 Cal.4th 572, 577 [110 Cal.Rptr.2d 809, 28 P.3d 860]), the payment limitations of section 53260 apply to any "settlement" a public employee "may receive" under his or her contract in the event that contract is severed or terminated before the end of the contract term. Use of the permissive verbal auxiliary "may" suggests the statute does not mandate that the employee receive any of the specified cash and benefits upon contract termination. (See *In re Richard E.* (1978) 21 Cal.3d 349, 354 [146 Cal.Rptr. 604, 579 P.2d 495] ["The ordinary import of 'may' is a grant of discretion."], superseded by statute on other grounds as stated in *In re Mario C.* (1990) 226 Cal.App.3d 599, 606 [276 Cal.Rptr. 548].) That conclusion is bolstered by subdivision (c) of section 53260, which provides that the formulas of subdivisions (a) and (b) are "maximum ceiling[s]," not

---

[8] With respect to the nature of Richart's employment, Page is correct. It is well settled that the terms and conditions of public employment—as is Richart's employment by District—is governed by statute. (*Miller v. State of California* (1977) 18 Cal.3d 808, 813–814 [135 Cal.Rptr. 386, 557 P.2d 970]; see also *Shoemaker v. Myers* (1990) 52 Cal.3d 1, 23–24 [276 Cal.Rptr. 303, 801 P.2d 1054]; *Lachtman v. Regents of University of California* (2007) 158 Cal.App.4th 187, 207 [70 Cal.Rptr.3d 147]; *Hill v. City of Long Beach* (1995) 33 Cal.App.4th 1684, 1690–1691 [40 Cal.Rptr.2d 125].) However, by statute, District was authorized to enter into a contract with Richart of up to four years in duration. (Ed. Code, § 72411, subd. (a).) Richart's contract with District was for more than a one-year term, and thus if District elected not to rehire her, she was entitled to notice of termination at least six months in advance of her contract's expiration. (Ed. Code, § 72411, subd. (b).)

target or example amounts. Thus, depending on the number of months remaining on the unexpired term of the employee's contract, the employer and employee are entitled to negotiate a cash settlement of any amount up to the specified maximum. These conclusions, however, do not resolve the legality of Richart's settlement.

The statute does not speak to the underlying *reasons* for the contract termination or the nature of legal claims, if any, asserted by the public employee in connection with such termination; it is silent on those points. On its face, the statute's application is unqualified: it is not conditioned by or limited to any particular circumstance prompting the termination and settlement of the public employee's contract. Rather, its cash and noncash settlement limitations apply "if the contract is terminated" regardless of the underlying reasons for termination or the employee's legal claims he or she may possess at the time of termination. Importantly, the Legislature used the term "settlement" in delineating the limits of sections 53260 and 53261. Black's Law Dictionary defines a settlement as "[a]n agreement ending a dispute or lawsuit." (Black's Law Dict. (8th ed. 2004) p. 1405, col. 1.) By definition, a settlement requires two sides to surrender some of their aims, resulting in objectives both gained and compromised. The Legislature's use of the term "settlement" in the phrase "maximum cash settlement" suggests it contemplated instances in which both parties seek to resolve all of their disputes—of whatever nature—existing between them at the time of contract termination. (See *Mares v. Baughman* (2001) 92 Cal.App.4th 672, 676 [112 Cal.Rptr.2d 264] [a settlement is an agreement between the parties to a dispute regarding how that dispute will be resolved].) Page thus asks us to apply the maxim that if words of a statute are clear, the court should not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history. (*Arntz Builders v. City of Berkeley* (2008) 166 Cal.App.4th 276, 285 [82 Cal.Rptr.3d 605].)

We agree that "[i]n the construction of a statute . . . , [our role] is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted . . . ." (Code Civ. Proc., § 1858; see *California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist.* (1997) 14 Cal.4th 627, 633 [59 Cal.Rptr.2d 671, 927 P.2d 1175] [" 'This court has no power to rewrite the statute so as to make it conform to a presumed intention which is not expressed.' "].) However, the Legislature's intended scope of sections 53260 and 53261's maximum settlement formula, and whether or not it applies to limit the settlement of tort claims that an employee may believe he or she possesses at the time of contract termination, is not clear from the statutes' face. Accordingly, we turn to the legislative history. (Cf. *Kavanaugh v. West Sonoma County Union High School Dist.* (2003) 29 Cal.4th 911, 920–921 [129 Cal.Rptr.2d 811, 62 P.3d 54] [where statutory language does not illuminate

statute's most reasonable meaning, court turns to legislative history and apparent purpose of the Legislature]; e.g., *Barratt American, Inc. v. City of Rancho Cucamonga* (2005) 37 Cal.4th 685, 697 [37 Cal.Rptr.3d 149, 124 P.3d 719].)[9]

Sections 53260 and 53261 were added by Senate Bill No. 1996 (1991–1992 Reg. Sess.) (Stats. 1992, ch. 962, § 6, p. 4563) via incorporation of the provisions of Senate Bill No. 1972 (1991–1992 Reg. Sess.), which was introduced by Senator Gary Hart on February 21, 1992. (See Floor Statement for Conc. Assem. Amends.) The Department of Finance Enrolled Bill Report states: "Current law does not require local agency employers to include in employment contracts a provision limiting the cash settlement if the contract is terminated. This bill would require local agency employers to include a provision limiting the maximum cash settlement to 18 months salary if the contract is terminated." (Cal. Dept. of Finance, Enrolled Bill Rep. on Sen. Bill No. 1996 (1991–1992 Reg. Sess.) Sept. 4, 1992, p. 2; see *Elsner v. Uveges, supra,* 34 Cal.4th at p. 934, fn. 19 [enrolled bill report is instructive on matters of legislative intent].) As amended on June 24, 1992, section 53260 omitted prior language that required the employer and employee to agree to the contract termination. The statute was amended to limit the maximum cash settlement "if the contract is terminated . . . ." The history indicates that legislators were concerned about covering instances where the employer unilaterally elected to terminate the contract. (See Sen. Com. on Local Government, Analysis of Sen. Bill No. 1972 (1991–1992 Reg. Sess.) p. 3 [raising question about a local agency taking unilateral action to fire an executive and proposing the committee consider an amendment to limit cash settlements "no matter who terminates the employment contract"].)

Analyses by the Assembly's and Senate's local government committees of Senate Bill No. 1972 (1991–1992 Reg. Sess.) are not particularly helpful, as they reiterate the statutory language. However, the Assembly Local Government Committee analysis states: "[T]he author has introduced this bill to address the concern that local governments are using their limited public resources to 'buy out' the contracts of highly paid executives." (Assem. Com. on Local Government, Analysis of Sen. Bill No. 1972 (1991–1992 Reg. Sess.) as amended June 24, 1992, p. 3.) It provides the following background: "Most of the nearly 1.4 million Californians who work for local agencies

---

[9] Though District asserts the trial court sustained its objection to the legislative history materials, to the contrary the record shows the trial court only sustained, appropriately, its objection to the declaration of former Senator Hart, the author of the sponsoring bill. (See, e.g., *Kavanaugh v. West Sonoma County Union High School Dist., supra,* 29 Cal.4th at p. 920, fn. 6.) We are not prevented from considering the legislative materials submitted in connection with Page's motion for summary judgment, and we take judicial notice of certain additional materials relevant to legislative intent provided by Page's counsel from the Legislative Intent Service. (Evid. Code, §§ 452, 459.)

(i.e., counties, cities, special districts, school districts, and community college districts) serve in civil service systems. However, top administrators and managers usually serve at the pleasure of local elected officials. Some of these executive officials, such as school superintendents, city managers, county administrators, and their key aides, have employment contracts with their local agency employers." (*Id.* at p. 2.) It included conclusions from a January 1992 report of the state Auditor General, which noted that school and community college districts enter into employment contracts with their superintendents, and listed the average net settlement payments made upon early termination of the contract, as well as the remaining contract periods. (*Ibid.*) The Auditor General was concerned about the impact of early renegotiation, renewal and contract extension practices on the size of monetary settlements occurring upon early contract termination.

A Senate Local Government Committee analysis includes similar background and refers to the same Auditor General report, but provides further explanation: "Some observers are troubled that local governments use their scarce public revenues to 'buy out' the contracts of highly paid executives." That analysis reflects concern about the incidence of school district terminations of executive contracts following early renewal of the contract, resulting in very large severance payments: "Although relatively rare, some local governments buy-out their executives' contracts when they fire them. Even when school districts renew superintendents' contracts early, they sometimes turn around and let them go. These practices produce cash settlements that disturb public watchdogs. One hospital district terminated its chief executive 32 months before the contract expired, paying $206,042 in settlement. A community college district paid its superintendent $126,000 to settle the seven remaining months of an unexpired contract. While no-cut contracts may be fine for professional sports figures, local governments should not pay their former executives not to work. S.B. 1972 imposes statewide standards on local contracts to limit excessive cash settlements." (Sen. Com. on Local Government, Analysis of Sen. Bill No. 1972 (1991–1992 Reg. Sess.) p. 2.)

The legislative file contains several newspaper articles concerning early contract renewals of school district and other government officials, as well as the settlement of a superintendent's "early retirement" referenced by Page, which included attorney fees and a substantial settlement for his claim of personal injury and sickness. Though normally such articles are of little value (see *Bermudez v. Municipal Court* (1992) 1 Cal.4th 855, 863–864, fn. 6 [4 Cal.Rptr.2d 609, 823 P.2d 1210]), the committee reports reveal that the Legislature took into consideration several instances of what were considered excessively high buyouts of such contracts in implementing the limitations of sections 53260 and 53261. Further, the Legislature expressly considered, but rejected, having the statutory limitations apply only to circumstances in

which the parties mutually agreed to terminate the contract, presumably instances not involving the employee's assertion of legal claims or causes of action.

█ Because the legislative history is unclear, we decline to read intent into the statute when the history clearly does not support it. (E.g., *Campbell v. Regents of University. of California* (2005) 35 Cal.4th 311, 331 [25 Cal.Rptr.3d 320, 106 P.3d 976].) " ' " 'An intent that finds no expression in the words of the statute cannot be found to exist. The courts may not speculate that the legislature meant something other than what it said. Nor may they rewrite a statute to make it express an intention not expressed therein.' " [Citation.]' [Citations.] 'The plain meaning of words in a statute may be disregarded only when that meaning is " 'repugnant to the general purview of the act,' or for some other compelling reason . . . . " [Citation.]' [Citation.] 'Courts must take a statute as they find it, and if its operation results in inequality or hardship in some cases, the remedy therefor lies with the legislative authority.' " (*Unzueta v. Ocean View School Dist.* (1992) 6 Cal.App.4th 1689, 1697 [8 Cal.Rptr.2d 614].)

█ We apply the plain meaning rule, under which the Legislature used unqualified language to limit "settlement[s]" upon an employee's contract termination. We are compelled to conclude the Legislature's purpose was to set strict limits on cash and "noncash items" payable in settlements upon termination of a local agency administrator's contract, without regard for the circumstances existing at the time of termination, the reasons, if any, for termination, or the nature of the disputes between the parties. Under our construction of the statutes, it is of no consequence that an employee under contract asserts legal claims against the local agency employer prior to contract termination. If that employee and employer nevertheless elect to terminate employment in the face of those claims (or the employer unilaterally terminates the contract), the employee's cash settlement, if any, is capped at 18 months of salary as specified in section 53620, and noncash benefits are limited to health benefits as specified in section 53621. Other cash and noncash benefits such as car allowances, money damages or attorney fees, are simply not included in the formula.

█ Our conclusion is consistent with the principle that "a statute should be interpreted ' "with reference to the whole system of law of which it is a part so that all may be harmonized and have effect." ' " (*Kavanaugh v. West Sonoma County Union High School Dist., supra*, 29 Cal.4th at p. 919.) █ The Legislature is deemed to know that a local agency employee's claim for money damages against his or her employer must be made in compliance with Government Tort Claims Act procedures. Absent such compliance, it would not expect the local agency to legitimately negotiate a

settlement of any claim for money damages in connection with an employee's contract termination, even if the employee believed he or she possessed such claims. "The claim-filing requirement of the Government Claims Act serves several purposes: (1) to provide the public entity with sufficient information to allow it to make a thorough investigation of the matter; (2) to facilitate settlement of meritorious claims; (3) to enable the public entity to engage in fiscal planning; and (4) to avoid similar liability in the future." (*Westcon Construction Corp. v. County of Sacramento* (2007) 152 Cal.App.4th 183, 200 [61 Cal.Rptr.3d 89].) In this vein, we note that Ottilie's June 14, 2007 letter—the only indication that Richart possessed claims against District or individual trustees before the parties reached a settlement—does not satisfy the government claim filing requirements. A letter merely mentioning potential claims without identifying the amount of money damages (if under $10,000 or if over $10,000, without indicating whether the claim was a limited civil case) is insufficient as a matter of law to satisfy the government claim filing requirements. (See § 910 [identifying required elements of claim]; *Connelly v. County of Fresno, supra,* 146 Cal.App.4th at p. 37; e.g., *Loehr v. Ventura County Community College Dist.* (1983) 147 Cal.App.3d 1071, 1083 [195 Cal.Rptr. 576].) Nor did the letter constitute a "claim as presented," which would have put District on notice and triggered a duty on it to notify Richart of defects or omissions so as to avoid a waiver of its sufficiency. (*Westcon,* 152 Cal.App.4th at p. 202.) A claim as presented constitutes a written communication " 'that a claim for monetary damages exists and that litigation may ensue . . . .' " (*Ibid.,* quoting *Alliance Financial v. City and County of San Francisco* (1998) 64 Cal.App.4th 635, 643–644 [75 Cal.Rptr.2d 341]; see also *Phillips v. Desert Hospital Dist.* (1989) 49 Cal.3d 699, 710 [263 Cal.Rptr. 119, 780 P.2d 349] ["provided the existence of a claim for monetary damages is definitely disclosed by the document [asserted to be a claim as presented], that burden upon the public entity is precisely the intended effect of the statutory notice and defense-waiver provisions"]; *Schaefer Dixon Associates v. Santa Ana Watershed Project Authority* (1996) 48 Cal.App.4th 524, 533–534 [55 Cal.Rptr.2d 698] [letter from contractor providing information and requesting negotiation of an ongoing dispute without advising of imminent litigation was not a claim under the Government Tort Claims Act].)

Here, the undisputed facts reveal that any potential legal claims Richart may have possessed against District or individual trustees led up to and were connected with the decision to end her contract and negotiate a settlement. Under the circumstances, Richart was faced with the decision to pursue a settlement of her disputes with District within the limitations of sections 53260 and 53261, or pursue her claims for "money or damages" independent of any settlement in accordance with the presentment requirements and procedures of the Government Tort Claims Act. (See §§ 905, 905.2; *City of San Jose v.*

*Superior Court* (1974) 12 Cal.3d 447, 454 [115 Cal.Rptr. 797, 525 P.2d 701] ["[i]n actions for damages against local public entities, the claims statutes require timely filing of a proper claim as a condition precedent to the maintenance of the action"]; *Connelly v. County of Fresno, supra,* 146 Cal.App.4th at p. 36; *Loehr v. Ventura County Community College Dist., supra,* 147 Cal.App.3d at p. 1079.)[10]

■ District argues an interpretation that limits settlements in the manner prescribed by the Legislature would require local agencies to take many more cases to trial because the settlement of a large legitimate claim would be illegal. It is possible that the effect of these statutes may not promote public policy in favor of the settlement of disputes without litigation. But such policy arguments are not within our purview. "As an intermediate court of review, ' "[o]ur function is not to judge the wisdom of statutes." ' [Citations.] We may not act as 'a super-Legislature,' nor are we free 'to enforce what we think best.' " (*Martin v. Santa Clara Unified School Dist.* (2002) 102 Cal.App.4th 241, 252 [125 Cal.Rptr.2d 337]; see also *Wells Fargo Bank v. Superior Court* (1991) 53 Cal.3d 1082, 1099 [282 Cal.Rptr. 841, 811 P.2d 1025].) Given our construction of sections 53260 and 53261, we conclude the trial court erred in granting District and Richart summary judgment on Page's causes of action for illegal expenditure of public funds and unjust enrichment. Page was entitled to summary adjudication of those causes of action in his favor.

## C. *Waste/Illegal Gift of Public Funds (Fifth Cause of Action)*

In his fifth cause of action, Page alleged that because District had not taken any adverse employment action against Richart, who had received majority support of the Board, the District was not liable to her under any valid theory of relief. He alleged that, as a result, Richart's agreement to waive her potential claims did not constitute consideration sufficient to justify the payment of $650,000 in money damages, and thus that payment (as well as the payment for her undocumented claim for attorney fees and $3,150 monthly expense allowance) constituted an illegal gift of public funds in violation of article XVI, section 6 of the California Constitution.

In moving for summary judgment, both District and Richart argued District's payment was made in good faith settlement of a dispute, primarily evidenced by District's employment of Judge Moon as a mediator and the fact the parties engaged in an 11- to 12-hour mediation session. Richart also pointed to her deposition testimony that she suffered significant mental,

---

[10] We recognize that Richart's election to pursue, and not waive, her claims for damages, attorney fees and other benefits not specified in sections 53260 and 53261 may have compelled District to act differently, including by rejecting a buyout of her contract.

emotional and physical distress and damage to her reputation, and believed she would no longer be able to obtain a significant job in higher education. Both District and Richart pointed to a declaration provided by Judge Moon, who stated that the "fair settlement value" of the case was far in excess of $2 million and that, based on Attorney Ottilie's letter and other materials, it appeared the minority trustees had breached the Brown Act by discussing personnel matters concerning Richart. Acknowledging that his testimony concerning the mediation was inadmissible, Judge Moon averred that his declaration centered on events "subsequent to" and "outside of" the mediation. In his reply brief, Page argues without record citation that the trial court disregarded Judge Moon's declaration.

▮ " ' "It is well settled that the primary question to be considered in determining whether an appropriation of public funds is to be considered a gift is whether the funds are to be used for a public or private purpose. If they are to be used for a public purpose, they are not a gift within the meaning of this constitutional prohibition." ' " (*Sturgeon v. County of Los Angeles* (2008) 167 Cal.App.4th 630, 637 [84 Cal.Rptr.3d 242].)[11] Relevant here, "[t]he settlement of a good faith dispute between the state and a private party is an appropriate use of public funds and not a gift because the relinquishment of a colorable legal claim in return for settlement funds is good consideration and establishes a valid public purpose. [Citation.] The compromise of a wholly invalid claim, however, is inadequate consideration and the expenditure of public funds for such a claim serves no public purpose and violates the gift clause." (*Jordan v. Department of Motor Vehicles* (2002) 100 Cal.App.4th 431, 450 [123 Cal.Rptr.2d 122], citing *Orange County Foundation v. Irvine Co.* (1983) 139 Cal.App.3d 195, 200 [188 Cal.Rptr. 552] (*Orange County Foundation*).) In *Orange County Foundation*, the Court of Appeal reversed the grant of summary judgment on a taxpayer's gift clause action stemming from a settlement between a private party (Irvine) and the state because the motion did not directly address Irvine's knowledge of the validity of its claim, and the denial of the taxpayer's allegations would have left a disputed, triable issue in any event. (*Orange County Foundation*, at p. 201.) The court held there was a triable issue as to "whether the Irvine Company's compromised title claims to certain islands were knowingly spurious." (*Id.* at p. 198.)

---

[11] *Sturgeon* points out that the constitutional ban applies to counties and general law cities, but not charter cities. (*Sturgeon v. County of Los Angeles, supra,* 167 Cal.App.4th at p. 637 & fn. 5.) The constitutional provision has also been applied to school districts. (See *Martin v. Santa Clara Unified School Dist., supra,* 102 Cal.App.4th at pp. 252–253.) District and Richart do not challenge the provision's application to a community college district.

Page contends District's settlement of Richart's claims constitutes an unlawful gift of public funds and waste[12] as was the case in *Orange County Foundation, supra*, 139 Cal.App.3d 195. He argues the trial court erred by requiring him to prove Richart's subjective state of mind about the validity of her claims and instead should have decided independently whether Richart had a colorable theory of recovery against District or any individual trustee. Page's focus on the trial court's rulings is unhelpful, because, as stated, our role on appeal from a summary judgment is to assess the parties' papers and evidence de novo. (*Ace American Ins. Co. v. Walker* (2004) 121 Cal.App.4th 1017, 1027 [18 Cal.Rptr.3d 1].)

Page further argues we should hold that District's payments to Richart in excess of the statutory limits of section 53260 and 53261 were an unlawful gift because they exceed District's maximum legal exposure, like the attorney fees that exceeded the limitations of a statute (Rev. & Tax. Code, § 6909, subd. (b)) and public policy in *Jordan v. Department of Motor Vehicles, supra*, 100 Cal.App.4th at pages 445, 450–452. He maintains Richart's failure to file a written claim under the Government Tort Claims Act provided District with a complete defense to any lawsuit for money damages, and any work-related injury claims, such as Richart's claims for emotional distress, would be barred by the workers compensation statutes.

■ Having concluded that District's payments to Richart in settlement exceed the maximum cash and noncash limitations set out by law on termination of her contract, we hold District and Richart were not entitled to summary judgment on Page's fifth cause of action. The settlement of Richart and District's dispute was accomplished by District paying more than its maximum legal exposure, and thus it is "akin to payment of a wholly invalid claim" in violation of the gift clause. (*Jordan v. Department of Motor Vehicles, supra*, 100 Cal.App.4th at pp. 450–451.) That conclusion alone warrants denial of summary judgment on Page's fifth cause of action.

Furthermore, we hold triable issues of fact otherwise prevent summary judgment on Page's cause of action asserting an illegal gift of public funds.

---

[12] " ' "[T]he term ' "waste" ' as used in [Code of Civil Procedure] section 526a means something more than an alleged mistake by public officials in matters involving the exercise of judgment or wide discretion. To hold otherwise would invite constant harassment of city and county officers by disgruntled citizens and could seriously hamper our representative form of government at the local level. Thus, the courts should not take judicial cognizance of disputes which are primarily political in nature, nor should they attempt to enjoin every expenditure which does not meet with a taxpayer's approval. On the other hand, a court must not close its eyes to wasteful, improvident and completely unnecessary public spending, merely because it is done in the exercise of a lawful power." ' " (*Sturgeon v. County of Los Angeles, supra*, 167 Cal.App.4th at p. 639, quoting *Sundance v. Municipal Court* (1986) 42 Cal.3d 1101, 1138–1139 [232 Cal.Rptr. 814, 729 P.2d 80].)

Richart's good faith belief in her dispute with District is relevant to the inquiry under *Orange County Foundation, supra,* 139 Cal.App.3d at pages 198, 200. Good faith, or its absence, involves a factual inquiry into a person's subjective state of mind, based on all the circumstances. (See *Clark v. Optical Coating Laboratory, Inc.* (2008) 165 Cal.App.4th 150, 183 [80 Cal.Rptr.3d 812]; *Peak-Las Positas Partners v. Bollag* (2009) 172 Cal.App.4th 101, 106 [90 Cal.Rptr.3d 775].) A subjective state of mind is rarely susceptible of direct proof, and a trial court will usually have to infer it from circumstantial evidence. (*Clark,* at p. 183.)

Delving into the evidence pertaining to Richart's good faith belief in her claims (viewing it favorably to Page), we observe that initially, Richart vaguely characterized her claims as involving due process and privacy violations. It is undisputed that Richart and District did not disclose the nature of those claims in their settlement agreement. At the time of the Board and Richart's settlement negotiations and the Board's initial approval of the settlement, which as we explain below had occurred during an improper closed meeting, Richart had not formally asserted any tort claims; District had no government tort claim filing against it by which it could legitimately assess the nature Richart's claims. Absent such a filing, a trier of fact could question whether the District had sufficient information to make a thorough investigation of the merit of Richart's claims. (See *Westcon Construction Corp. v. County of Sacramento, supra,* 152 Cal.App.4th at p. 202.) Page correctly asserts that noncompliance with the Government Tort Claims Act provided District with a complete defense to any claim by Richart for money or damages. (§§ 905, 905.2, 945.4, 945.6; *State of California v. Superior Court* (2004) 32 Cal.4th 1234, 1235 [13 Cal.Rptr.3d 534, 90 P.3d 116]; *Connelly v. County of Fresno, supra,* 146 Cal.App.4th at p. 37.) We acknowledge Richart's counsel subsequently provided a lengthy letter to District explaining Richart's position before the District entered into its second closed meeting and reauthorized the settlement. In our view, that evidence does not warrant a conclusion that Richart's underlying claims were made in good faith or "colorable" as a matter of law to warrant summary judgment of Page's fifth cause of action. Under these circumstances, these questions are for the trier of fact.

Finally, Page points to, among other things, the legal impossibility of any claim for constructive discharge advanced by Richart as an underlying basis for her settlement. He points out that Richart had not quit her job, so the Board could not reasonably maintain a good faith belief that such a claim was colorable. Richart simply responds that such a termination exists when a reasonable person has been subject to such intolerable conditions as to justify

her resignation. The essence of the "intolerable conditions" requirement of a viable claim for constructive discharge is whether, under all the circumstances, the working conditions are so unusually adverse that a reasonable employee in the plaintiff's position would have felt compelled to resign. (*Thompson v. Tracor Flight Systems, Inc.* (2001) 86 Cal.App.4th 1156, 1167 [104 Cal.Rptr.2d 95]; see also *Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1247 [32 Cal.Rptr.2d 223, 876 P.2d 1022].) The working conditions must be unusually aggravated or amount to a continuous pattern before the situation will be deemed intolerable; a poor performance rating or demotion by itself does not suffice. (*Thompson,* at p. 1167.)

■ Here, the evidence shows that despite public criticism by a minority of the trustees, Richart continued to have support of the majority of the Board, which had not taken any adverse employment action against her. These facts are sufficient to require the trier of fact to decide the validity of District's settlement. The determination that a reasonable employee would have been compelled to quit is "quintessentially a jury function." (*Thompson v. Tracor Flight Systems, Inc., supra,* 86 Cal.App.4th at pp. 1170–1171.) That is the case here.

II. *Demurrers to Second Cause of Action for Violation of Brown Act, Section 54956.9*

■ Page contends the trial court erred by sustaining without prejudice respondents' demurrers to his second cause of action, alleging a violation of section 54956.9[13] of the Brown Act, also known as the "pending litigation exception." (See *Shapiro v. Board of Directors* (2005) 134 Cal.App.4th 170, 179–180 [35 Cal.Rptr.3d 826] (*Shapiro*); *Trancas Property Owners Assn. v. City of Malibu* (2006) 138 Cal.App.4th 172, 180 [41 Cal.Rptr.3d 200].) That section "creates an exception to the Brown Act's open meeting requirements for meetings with legal counsel regarding pending litigation" and allows " 'a legislative body of a local agency' to hold 'a closed session to confer with, or receive advice from, its legal counsel regarding pending litigation when discussion in open session concerning those matters would prejudice the position of the local agency in the litigation.' " (*Shapiro,* at p. 179.) The section has been interpreted by this state's high court to permit the legislative

---

[13] In part, section 54956.9 provides: "Nothing in this chapter shall be construed to prevent a legislative body of a local agency, based on advice of its legal counsel, from holding a closed session to confer with, or receive advice from, its legal counsel regarding pending litigation when discussion in open session concerning those matters would prejudice the position of the local agency in the litigation. [¶] . . . [¶] For purposes of this section, litigation shall be considered pending when any of the following circumstances exist: [¶] . . . [¶] (b)(1) A point has been reached where, in the opinion of the legislative body of the local agency on the advice of its legal counsel, based on existing facts and circumstances, there is a significant exposure to litigation against the local agency."

body to "confer with its attorney and then decide in private such matters as the upper and lower limits with respect to settlement, whether to accept a settlement or make a counter offer, or even whether to settle at all. . . ." (*Peevey, supra,* 31 Cal.4th at pp. 799–800 [relying on and quoting 75 Ops.Cal.Atty.Gen. 14 (1992) to interpret similarly worded provision in the Bagley-Keene Open Meeting Act (§ 11120 et seq.)]; see *Trancas,* 138 Cal.App.4th at p. 187 [referencing to such action as an "implied exception for adoption of litigation settlements in closed session"].) " 'These are matters which will depend upon the strength and weakness of the individual case as developed from conferring with counsel. A local agency of necessity must be able to decide and instruct its counsel with respect to these matters in private.' " (*Peevey,* at p. 799, quoting 75 Ops.Cal.Atty.Gen., *supra,* at pp. 19–20.)

## A. *Standard of Review*

"In determining whether [Page] properly stated a claim for relief, our standard of review is clear: ' "We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed." [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the [petitioner].' " (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1126 [119 Cal.Rptr.2d 709, 45 P.3d 1171]; see also *City of Dinuba v. County of Tulare* (2007) 41 Cal.4th 859, 865 [62 Cal.Rptr.3d 614, 161 P.3d 1168]; *Lucas v. Santa Maria Public Airport Dist., supra,* 39 Cal.App.4th at p. 1022.)

Page's pleading must be construed "liberally . . . with a view to substantial justice between the parties." (Code Civ. Proc., § 452.) If the petition states any possible legal theory, the trial court's order sustaining the demurrer must be reversed. (*Palestini v. General Dynamics Corp.* (2002) 99 Cal.App.4th 80, 86 [120 Cal.Rptr.2d 741].) We assess the sufficiency of Page's second cause of action, not the truth or accuracy of the factual allegations or Page's ability to prove them. (See *216 Sutter Bay Associates v. County of Sutter* (1997) 58 Cal.App.4th 860, 866 [68 Cal.Rptr.2d 492]; *Alcorn v. Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 496 [86 Cal.Rptr. 88, 468 P.2d 216].)

## B. *Analysis*

■■■ Under the Brown Act, any "interested person" may seek mandamus to stop or prevent violations or threatened violations of the Brown Act or to determine the Act's application to actions or threatened future actions of the local agency. (§ 54960, subd. (a).) Individuals may also bring a mandamus action for a judicial determination nullifying a local agency action taken in violation of the Brown Act. (§ 54960.1, subd. (a).) To state a cause of action for violation of section 54960.1 of the Brown Act, a petitioner must allege " '(1) that a legislative body of a local agency violated one or more enumerated Brown Act statutes; (2) that there was "action taken" by the local legislative body in connection with the violation; and (3) that before commencing the action, plaintiff made a timely demand of the legislative body to cure or correct the action alleged to have been taken in violation of the enumerated statutes, and the legislative body did not cure or correct the challenged action.' " (*Bell v. Vista Unified School Dist.* (2000) 82 Cal.App.4th 672, 684 [98 Cal.Rptr.2d 263].)

Page asserts his cause of action challenges not the Board's discussions with its counsel, but its conduct in negotiating with an adverse party and her lawyer, as well as mediating a dispute with a private professional mediator, acts assertedly exceeding the scope of activity allowed in a closed session conference authorized by section 54952.2. Page further argues the Board cannot avoid its Brown Act violation by pointing to his allegation that Judge Moon remained outside the closed session conference room, as those discussions with Judge Moon constituted "serial meetings" in violation of section 54952.2.[14] Finally, Page argues the District did not cure or correct its Brown Act violation because it did not rescind all of the actions taken by it and renegotiate the terms of Richart's settlement agreement.

---

[14] In part, section 54952.2 provides: "(a) As used in this chapter, 'meeting' means any congregation of a majority of the members of a legislative body at the same time and location, including teleconference location as permitted by Section 54953, to hear, discuss, deliberate, or take action on any item that is within the subject matter jurisdiction of the legislative body. [¶] (b)(1) A majority of the members of a legislative body shall not, outside a meeting authorized by this chapter, use a series of communications of any kind, directly or through intermediaries, to discuss, deliberate, or take action on any item of business that is within the subject matter jurisdiction of the legislative body. [¶] (2) Paragraph (1) shall not be construed as preventing an employee or official of a local agency, from engaging in separate conversations or communications outside of a meeting authorized by this chapter with members of a legislative body in order to answer questions or provide information regarding a matter that is within the subject matter jurisdiction of the local agency, if that person does not communicate to members of the legislative body the comments or position of any other member or members of the legislative body. [¶] (c) Nothing in this section shall impose the requirements of this chapter upon any of the following: [¶] (1) Individual contacts or conversations between a member of a legislative body and any other person that do not violate subdivision (b)."

Richart and District both point to the Attorney General's analysis of the pending litigation exception (75 Ops.Cal.Atty.Gen., *supra*, at p. 20), which authorizes the Board "to deliberate and take action upon the settlement of a lawsuit" in closed session. They argue District was permitted to decide the terms of Richart's settlement in closed session and confer with "legal counsel," including Judge Moon. (*Ibid.*) Alternatively, they argue any violation was cured as shown by a subsequent agenda and meeting minutes, of which the trial court properly took judicial notice.

Disregarding contentions, deductions and conclusions of law, and accepting the truth of Page's material factual allegations, Page alleges that on June 19, 2007, immediately following a regular, open and public meeting, the Board adjourned to a closed session, and for approximately 11 hours "the Board, its counsel, Victoria Richart, and Victoria Richart's legal counsel engaged in mediation with retired Judge David Moon to resolve Dr. Richart's 'potential' (rather than 'actual') claims that Dr. Richart 'may' have had against the District, College[,] the Board . . . and individual members of the Board. . . ." He alleges Judge Moon was "not associated with, or employed by, the District or its Board of Trustees," and that neither Judge Moon's retention, nor any execution of a confidentiality agreement, was noticed on any advance agenda for the closed session. Page alleges that throughout the closed session, individual trustees regularly and repeatedly left the boardroom to meet with Judge Moon, who spoke directly to the individual trustees about the resolution and settlement of Richart's claims against the District, Board and individual trustees. He alleges the Board reached a consensus to enter into a settlement agreement with Richart, and immediately following the mediation, District, the Board and Richart entered into a binding settlement agreement even though the Board had not been provided with documentation concerning the amount of Richart's legal fees or the actual amount of her retirement benefit. Page alleges that on July 1, 2007, he served the Board and its legal counsel with a demand to cure and correct its failure to hold an open and public meeting concerning the settlement negotiations with Richart, and that the District had not cured the identified violations "to date."

██ To determine whether these allegations state a cause of action for violation of the Brown Act's section 54956.9, we are guided by the principle that " '[s]tatutory exceptions authorizing closed sessions of legislative bodies are construed narrowly and the Brown Act "sunshine law" is construed liberally in favor of openness in conducting public business.' " (*Shapiro, supra*, 134 Cal.App.4th at pp. 180–181, quoting *Shapiro v. San Diego City Council* (2002) 96 Cal.App.4th 904, 917 [117 Cal.Rptr.2d 631]; see also *Roberts v. City of Palmdale* (1993) 5 Cal.4th 363, 378 [20 Cal.Rptr.2d 330, 853 P.2d 496] (*Roberts*) [1987 amendment to Brown Act "was intended to make it clear that closed sessions with counsel could *only* occur as provided in the Brown Act" (italics added)]; *Wolfe v. City of Fremont* (2006) 144

Cal.App.4th 533, 545 [50 Cal.Rptr.3d 524] [Brown Act is a remedial statute that must be construed liberally so as to accomplish its purpose]; 71 Ops.Cal.Atty.Gen. 96, 105 (1988) ["Litigation exceptions to the Ralph M. Brown Act's open meeting requirements . . . must be strictly construed."].) Further, we are cognizant that Brown Act open meeting requirements encompass not only actions taken, but also factfinding meetings and deliberations leading up to those actions. (See § 54950 ["It is the intent of the [Brown Act] that [public agency] actions be taken openly and that their deliberations be conducted openly."]; *Roberts*, at p. 375; *Frazer v. Dixon Unified School Dist.* (1993) 18 Cal.App.4th 781, 794 [22 Cal.Rptr.2d 641]; *216 Sutter Bay Associates v. County of Sutter, supra*, 58 Cal.App.4th at pp. 876–877; 63 Ops.Cal.Atty.Gen. 820, 825 (1980) ["[T]he intent of the Act was that deliberations as well as actions be taken openly."].) " 'Deliberation in this context connotes not only collective decisionmaking, but also "the collective acquisition and exchange of facts preliminary to the ultimate decision." ' " (*216 Sutter Bay*, at p. 877.)

Looking to the content of section 54956.9 (*Shapiro, supra*, 134 Cal.App.4th at p. 182), we find nothing in its plain text authorizing the practice of mediating disputes or discussing potential litigation with opposing parties and their counsel. Respondents focus exclusively on the fact that Page has not alleged that Judge Moon was present in the closed meeting, instead alleging he met with trustees outside of the meeting. But that argument ignores Page's allegation that the Board engaged in negotiations and mediation with *Richart and her legal counsel*, an act that in our view is akin to the conduct we held was outside the scope of the litigation exception in *Shapiro*. There, we observed (via one of the parties' arguments) that though the Brown Act expressly permits closed sessions between the legislative body and its counsel regarding litigation, "there is no similar express authorization to meet in closed session where, as here, the legislative body delegates to another entity as its agent its powers to negotiate for the acquisition of real property." (*Shapiro*, at pp. 182–183, italics omitted.) Akin to *Shapiro*, there is no express authorization in section 54956.9 for a legislative body to meet in closed session to discuss and negotiate with an adversary and her counsel a matter of pending litigation. (See also 62 Ops.Cal.Atty.Gen. 150, 151–152 (1979) [opining that a meeting between two adverse parties and their counsel to settle potential litigation is not justified by the then implied exception to the Brown Act permitting a legislative body to meet with its attorney in executive session, nor are negotiations with adverse counsel encompassed, as their basic purpose is inconsistent with the protection of confidential communications between a party and his attorney]; *Bell v. Vista Unified School Dist., supra*, 82 Cal.App.4th at p. 683 [giving Attorney General's views considerable weight].)

Rather, section 54956.9 permits the Board to "confer with, or receive advice from, *its* legal counsel regarding pending litigation . . . ." (Italics added.) Page's allegations are not limited to such discussions or deliberations between the Board and its own attorney. And, as we explain, his allegations go beyond the Board's mere discussion of proposed settlement terms and conditions or "approval given" to its legal counsel of Richart's settlement. (See *Trancas Property Owners Assn. v. City of Malibu, supra*, 138 Cal.App.4th at pp. 184–185, citing *Peevey, supra*, 31 Cal.4th at pp. 798–799 and also quoting § 54957.1, subd. (a)(3) [requiring reporting of " '[a]pproval given to [legislative body's] legal counsel of a settlement of pending litigation' "].) "[A]s 'emphasized' in the Attorney General's manual on the Brown Act, 'the purpose of [section 54956.9] is to permit the body to receive legal advice and make litigation decisions only; it is not to be used as a subterfuge to reach nonlitigation oriented policy decisions.' " (*Trancas*, at p. 186.)

Page alleges that individual trustees regularly and repeatedly left the room to meet with Judge Moon, after which time they reached a consensus to enter into a settlement with Richart. Liberally construed, these are facts from which it can be concluded that the trustees used Judge Moon as a personal "go-between" to conduct information gathering in furtherance of collectively reaching terms and conditions for the resolution and settlement of Richart's claims in its closed session. (*Duval v. Board of Trustees* (2001) 93 Cal.App.4th 902, 906 [113 Cal.Rptr.2d 517] [when a court evaluates a complaint, the plaintiff is entitled to reasonable inferences from the facts pleaded], citing *Coleman v. Gulf Ins. Group* (1986) 41 Cal.3d 782, 789, fn. 3 [226 Cal.Rptr. 90, 718 P.2d 77].) The allegations show more than merely discussing and approving proposed settlement terms and conditions; they suggest the sort of " ' "collective acquisition and exchange of facts" ' " preliminary to an ultimate decision that must occur openly. (*216 Sutter Bay Associates v. County of Sutter, supra*, 58 Cal.App.4th at p. 877; see also *Frazer v. Dixon Unified School Dist., supra*, 18 Cal.App.4th at p. 795 [session where school board gathers information from prospective contractors about qualifications to perform services for the district is a meeting subject to Brown Act requirements even where no commitment is made to retain the persons interviewed].)

Such action would also violate section 54952.2, which prohibits a legislative body from using " 'personal intermediaries' " to exchange facts so as to reach a " 'collective concurrence' " outside the public forum. (*Wolfe v. City of Fremont, supra*, 144 Cal.App.4th at pp. 544–547; see also 84 Cal.Ops.Atty.Gen. 30, 31, 32 (2001) [use of e-mails by a majority of board members to " ' "exchange . . . facts," ' " " 'advance or clarify a member's understanding of an issue,' " or " 'advance the ultimate resolution of an issue' " regarding an agenda item violates § 54952.2].) "To prevent evasion of the Brown Act, a series of private meetings (known as serial meetings) by which a majority of the members of a legislative body commit themselves to

a decision concerning public business or engage in collective deliberation on public business would violate the open meeting requirement." (*216 Sutter Bay Associates v. County of Sutter, supra*, 58 Cal.App.4th at p. 877.) In connection with such meetings, the California Supreme Court has emphasized that "the intent of the Brown Act cannot be avoided by subterfuge; a concerted plan to engage in collective deliberation on public business through a series of letters or telephone calls passing from one member of the governing body to the next would violate the open meeting requirement." (*Roberts, supra*, 5 Cal.4th at p. 376.)

 District points out that Page did not allege that a *majority* of the Board members agreed to any action outside of the meeting, thus precluding any serial meeting violation of section 54952.2. We disagree. Section 54952.2's prohibition applies to use of an intermediary by a majority of the members of the legislative body. (See 84 Cal.Ops.Atty.Gen., *supra*, at p. 31, citing *Roberts, supra*, 5 Cal.4th at pp. 375–377.) Page alleges that "the Board" negotiated with Richart and reached a consensus about her settlement in its closed meeting, and we fairly infer from these allegations that the entire Board was present. These allegations bring the Board's conduct within the definition of a "meeting" as requiring a gathering of the majority of the members of a legislative body at the same time and location. (§ 54952.2; see also *Frazer v. Dixon Unified School Dist., supra*, 18 Cal.App.4th at pp. 795–797.) Concededly, it is not clear from Page's allegations the precise number of Board members who left the room to speak with Judge Moon outside of the closed session. Individual contacts or conversations with a member of a local body and another person are outside the scope of a Brown Act meeting. (§ 54952.2, subd. (c)(1).) Such vagueness, however, is of no moment where neither District nor Richart specially demurred to Page's cause of action.

District further argues the Legislature's public policy in favor of mediation should not exclude mediators like Judge Moon from being used by a governing board as "legal counsel," which is permitted by section 54956.9. District's argument disregards Page's allegation that Judge Moon was not associated with or employed by the District or its Board. But apart from that, we reject its policy argument on grounds similar to those we stated in *Shapiro, supra*, 134 Cal.App.4th at page 185. Though District may present a legitimate argument that mediation should be encouraged, "we are mindful that it is not our role, but rather that of the Legislature, to strike an appropriate balance between the competing interests of openness and efficiency in the context of the Brown Act. Public policy arguments in favor of a more expansive scope for section 54956.9 based on the interest of governmental efficiency must be directed to the Legislature, not this court." (*Ibid.*)

Alternatively, respondents maintain the trial court correctly took judicial notice of a subsequent agenda and meeting minutes from August 21, 2007, showing that any Brown Act violation had been cured, requiring the court to sustain its demurrer without leave to amend. If a local agency cures or corrects the alleged Brown Act violation, any nullification action shall be dismissed with prejudice. (§ 54960.1, subd. (e); *Bell v. Vista Unified School Dist., supra,* 82 Cal.App.4th at pp. 684–685.) Any action taken to cure or correct a prior action "shall not be construed or admissible as evidence of a [Brown Act] violation . . . ." (§ 54960.1, subd. (f).)[15]

We conclude issuance of a notice identifying Richart as the litigant, and minutes showing the Board had reconsidered and approved her settlement agreement, do not establish a cure of the Board's acts in impermissibly conducting information gathering in the course of mediating and negotiating with Richart in a closed meeting, actions that fall outside the Brown Act's pending litigation exception. (See *Boyle v. City of Redondo Beach* (1999) 70 Cal.App.4th 1109, 1117 [83 Cal.Rptr.2d 164] [city council in response to demand to cure and correct meaningfully reconsidered its initial improper action by rescinding all action taken at the meeting that was alleged to have been noticed in violation of the Brown Act].) The policy underlying the Brown Act is that public boards and agencies exist to aid in the conduct of the people's business; the law is intended to mandate open and public actions and deliberations. (§ 54950; *Epstein v. Hollywood Entertainment Dist. II Bus. Improvement Dist.* (2001) 87 Cal.App.4th 862, 868, fn. 7 [104 Cal.Rptr.2d 857].) Thus, the public is entitled to monitor and provide input on the Board's collective acquisition and exchange of facts (see *Roberts, supra,* 5 Cal.4th at p. 376) in furtherance of a mediation or resolution of Richart's claims. In sum, the trial court erred in sustaining respondents' demurrers to Page's second cause of action without leave to amend.

---

[15] The Board's agenda for its later August 21, 2007 meeting stated: "CONFERENCE WITH LEGAL COUNSEL—ANTICIPATED LITIGATION [¶] Significant exposure to litigation pursuant to subdivision (b) of Section 54956.9: Munoz-Richart v. MiraCosta Community College District." The August 21, 2007 meeting minutes state: "Board President Adams announced the following at 1:05 p.m.: The Governing Board is going into closed session with legal counsel on six pending litigation items listed on the agenda. As regards to items 3 and 4, the pending litigation is defined in Government Code section 54945.9(b)(3)(c)." The minutes further indicate the Board reconvened from its closed session and took the following action: "The Governing Board met and reconsidered the settlement agreement with Dr. Victoria Munoz Richart. In addition to all the previous information available to the Board, the Board also received and considered additional correspondence dated August 15, 2007, from counsel for Dr. Richart and a declaration dated August 21, 2007, from retired judge David B. Moon. In addition, the Board also considered the proposed petition for writ of mandate from Mr. Leon Page. The Board voted 4 to 0 to reconfirm its settlement with Dr. Victoria Munoz Richart."

## DISPOSITION

The judgment is reversed. The matter is remanded with directions that the trial court (1) enter an order granting summary adjudication of Page's first and third causes of action for Brown Act violations in District's favor and granting summary adjudication of Page's fourth and sixth causes of action in Page's favor; (2) vacate its order sustaining respondents' demurrers to Page's second cause of action; and (3) enter an order overruling respondents' demurrers to the second cause of action. The parties shall bear their own costs on appeal.

Huffman, Acting P. J., and Aaron, J., concurred.

A petition for a rehearing was denied December 18, 2009, and respondents' petition for review by the Supreme Court was denied March 24, 2010, S179827.