Filed 4/22/13  Richart v. Miracosta Community College Dist. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEA, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| VICTORIA MUNOZ RICHART, | D061865 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 37-2011-00083862-CU-OE-CTL) |
| MIRACOSTA COMMUNITY COLLEGE DISTRICT, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Jacqueline

M. Stern, Judge.  Affirmed.

In this anti-SLAPP case, we largely agree with the trial court that plaintiff and

respondent Victoria Munoz Richart's complaint against defendant and appellant

MiraCosta Community College District (District) is not subject to a motion to strike

under the anti-SLAPP statute, Code of Civil Procedure[1] section 425.16.  The fact

---

[1]    All further statutory references are to the Code of Civil Procedure unless otherwise
indicated.

Richart's employment as a District administrator ended in 2010 following public controversy in 2006 and 2007 about her leadership does not bring the wrongful termination causes of action she is now asserting within the scope of the anti-SLAPP statute. The record shows Richart's wrongful termination causes of action against District are based on District's failure in 2009 and 2010 to perform duties imposed on it by the state and federal Constitutions, her contract with District or statute, and not on any exercise by District of any right protected under the petition and free speech provisions of the state and federal Constitutions. Thus, *at this point in the proceedings*, Richart's wrongful termination claims do not allege causes of action which arise "from any act in furtherance" of "right of petition or free speech" within the meaning of the anti-SLAPP statute.

As we also explain, with respect to Richart's claims she has been stigmatized by District's conduct in terminating her employment, the record is clear that her claims are based in substantial part on public statements individual members of District's board of trustee's (Board) made beginning in 2006. Thus, we conclude Richart's stigmatization claims are within the scope of the anti-SLAPP statute. However, we conclude that, with respect to those claims, Richart has provided sufficient evidence of likely success on the merits.

Finally, we conclude that Richart's retaliation claims, her claim she was subjected to a violent threat, and her declaratory relief cause of action are not within the scope of section 425.16.

2

In sum, because the claims Richart asserts are either outside the scope of the anti-SLAPP statute or Richart has shown a likelihood of success with respect to covered claims, we affirm the trial court's order denying District's motion to strike.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Tenure as College President and Settlement*

The circumstances giving rise to Richart's complaint were, in many material respects, summarized in our opinion in *Page v. MiraCosta Community College Dist.* (2009) 180 Cal.App.4th 471 (*Page*). In *Page*, we held that a settlement agreement Richart and District entered into during the controversy, which arose when she reported wrongdoing by other District employees and administrators, was invalid because it provided Richart with compensation which exceeded the limits set forth in Government Code sections 53260 and 53261.[2] These provisions limit what District may provide by

---

[2] Government Code section 53260 provides: "(a) All contracts of employment between an employee and a local agency employer shall include a provision which provides that regardless of the term of the contract, if the contract is terminated, the maximum cash settlement that an employee may receive shall be an amount equal to the monthly salary of the employee multiplied by the number of months left on the unexpired term of the contract. However, if the unexpired term of the contract is greater than 18 months, the maximum cash settlement shall be an amount equal to the monthly salary of the employee multiplied by 18.

"(b)(1) Notwithstanding subdivision (a), if a local agency employer, including an administrator appointed by the Superintendent, terminates its contract of employment with its district superintendent of schools that local agency employer may not provide a cash or noncash settlement to its superintendent in an amount greater than the superintendent's monthly salary multiplied by zero to six if the local agency employer believes, and subsequently confirms, pursuant to an independent audit, that the superintendent has engaged in fraud, misappropriation of funds, or other illegal fiscal practices. The amount of the cash settlement described in this paragraph shall be determined by an administrative law judge after a hearing.

3

way of a compromise of an employee's claims.

As summarized in *Page*, the circumstances which led to the settlement were as follows:

"In 2004, District hired Richart as the superintendent and president of [MiraCosta College]. She received high ratings in 2005 and 2006 performance evaluations. In July 2006, District renewed Richart's employment for an additional four-year term, from July 1, 2006, to June 20, 2010. Her employment agreement provided for an annual salary of approximately $227,200 with specified increases, health insurance, and other benefits. Her employment agreement also contained a provision mandated under section 53260 detailing the maximum cash settlement she 'may' receive 'if this Employment Agreement is terminated . . . .' [Fn. omitted.]

"In the summer of 2006, in response to a whistleblower's report, Richart initiated an investigation of alleged financial mismanagement within the college's horticulture department. She reported the matter to the district attorney, and the employee responsible for the day-to-day operations of that department was eventually charged with

---

"(2) This subdivision applies only to a contract for employment negotiated on or after the effective date of the act that added this subdivision.

"(c) The cash settlement formula described in subdivisions (a) and (b) are maximum ceiling on the amounts that may be paid by a local agency employer to an employee and is not a target or example of the amount of the cash settlement to be paid by a local agency employer to an employee in all contract termination cases."

Government Code section 53261 provides: "The cash settlement specified in Section 53260 shall not include any other noncash items except health benefits, which may be continued for the same duration of time as covered in the settlement, pursuant to the same time limitations as provided in Section 53260, or until the employee finds other employment, whichever occurs first."

and pleaded guilty to fraud.  At the end of November 2006, a secret vote by some college faculty members unhappy with Richart's actions resulted in a resolution of no confidence against her.

"By early 2007, the investigation and Richart's role in it had become increasingly controversial, resulting in complaints by the academic senate's president and council about Richart's general leadership.  The Board's president, however, issued a letter indicating the Board's support for Richart.  Large numbers of college employees began attending Board meetings to complain about the report and Richart's investigation.  On February 1, 2007, three trustees, Gloria Carranza, Jackie Simon and Judy Stratton, issued a 'minority response' that addressed and criticized the Board's responses to various concerns raised by the academic senate, in part accusing the Board majority of ignoring those and other faculty member concerns.

"Richart met the next day with Board president Charles Adams, former Board president Rudy Fernandez and District's general counsel to discuss the minority report and prepare a letter regarding the minority trustees' comments.  In her February 2, 2007 letter, Richart expressed her belief that the minority response was a public negative evaluation that undermined her office and the Board's ability to work together for the good of the college, and constituted a violation of her due process rights.  She expressed her belief that it might be in her best interest to publicly reveal past misconduct at the college that had occurred before her arrival.  At the same time, Board president Adams wrote to the trustees stating that the minority trustees had violated Richart's due process

5

and privacy rights, and informing them that opinions about Richart's performance had to be disclosed in closed session where it was on the agenda for evaluations. He instructed the trustees not to make any public evaluation statements about Richart.

"Later that month, during a public hearing, trustee Stratton read out loud portions of Richart's February 2, 2007 letter. She spoke negatively about Richart's letter and its content, and berated her in public. Trustee Carranza also spoke about Richart, reporting information from another letter Richart wrote to the Board in October 2006 and expressing 'fear and intimidation' as a result of Richart's February 2007 letter. Carranza stated she felt Richart's letter 'was threatening a public official . . . .' Another Board member responded that the minority trustees' actions in evaluating Richart in public and sending their response to the college's academic senate were legally improper and put the District at grave litigation risk. Following the hearing, trustee Stratton provided Richart's October 2006 and February 2007 letters to the attorney for the academic senate president.

"Eventually, Richart retained attorney Robert Ottilie to evaluate her claims against the individual trustees. District's vice-president of business and administrative services, Jim Austin, met on at least two occasions with District's claims adjuster, who indicated she believed Richart's claims presented a significant threat of litigation to District. The adjuster appointed legal counsel and agreed to mediate the dispute in front of retired Superior Court Judge David Moon. On June 8, 2007, Richart and Ottilie met with Austin, District's general counsel, and retired Judge Moon to present the facts of her claims. Based on his meetings, the discussions with Judge Moon and the claims

6

adjuster's analysis, Austin believed there was a substantial threat of litigation and risk of liability to District if Richart were to proceed with litigation. He recommended that the matter be set for the Board's consideration at a closed session.

"On June 14, 2007, Attorney Ottilie sent a letter to District's legal counsel proposing that they discuss resolution of claims Richart believed she possessed arising from the trustees' individual and collective conduct. [Fn. omitted.] Thereafter the Board issued a meeting agenda for June 19, 2007, announcing that a special Board meeting/closed session would be held by the Board under the following notice: 'Conference with Legal Counsel—Anticipated Litigation: Significant exposure to litigation pursuant to subdivision (b) of Section 54956.9: One case.'

"On June 19, 2007, the Board adjourned to a closed session, during which the Board and Richart, with the assistance of Judge Moon, reached a settlement in which Richart agreed to step down as president and serve as a consultant for the next 18 months. Judge Moon never entered the boardroom; groups of Board members in numbers less than a quorum left the room to meet with Judge Moon. The settlement agreement was drafted by District's counsel and signed by each trustee, including the minority trustees. In part the settlement and release agreement states: 'A dispute has occurred between the parties regarding Richart's employment with the college. Richart through her legal counsel filed a letter to explore and/or resolve claims. . . . The parties wish to settle their dispute.' Under the agreement, District would for 18 months pay Richart her monthly salary at her contract rate as well as 'step and CPI increases,' 'existing expenses' of $3,150

7

per month, health benefits, and contributions to the state retirement system. The agreement also required District to pay Richart $43,500 in personal attorney fees 'incurred to date related to her employment and potential claims against the COLLEGE,' and $650,000 'for damages' upon the agreement's execution. In exchange, Richart agreed to 'step down' on June 30, 2007. The agreement includes a mutual general release of all claims, as well as a Civil Code section 1542 waiver." (*Page*, *supra*, 180 Cal.App.4th at pp. 479-482.)

Under the terms of the settlement agreement, Richart continued working as a consultant to District through December 31, 2008. For its part, District appointed a new president and superintendent.

B. *Taxpayer Challenge of Settlement and Employment Status*

As we noted, after the settlement agreement was executed, a taxpayer and resident of District, Leon Page, sued District and Richart, alleging the settlement agreement was void because it provided Richart with compensation which exceeded the limits set forth in Government Code sections 53260 and 53261. Page also alleged that in entering into the settlement, District violated the open meeting requirements of The Ralph M. Brown Act (Gov. Code, § 54950.5 et seq.; Brown Act). By way of demurrer and motion for summary adjudication, District prevailed in the trial court. On appeal, however, we agreed with Page that the settlement exceeded the compensation limits of Government Code sections 53260 and 53261, and he had alleged a viable Brown Act claim. (*Page*, *supra*, 180 Cal.App.4th at pp. 478-479.)

8

On December 17, 2009, shortly after our opinion in *Page* was filed, the Board voted to not renew Richart's employment contract.

Between March 31, 2010, and December 1, 2010, Richart sent District correspondence in which she expressed her willingness to return to her job as president and superintendent. District did not respond to her offers.

On August 12, 2010, following issuance of our remittitur in *Page*, the trial court entered a judgment in favor of Page in which it invalidated the settlement agreement and determined Richart and District were each required to return the consideration each had received and both were relieved of any obligations they had undertaken.[3] In what she characterizes as an act of good faith, Richart began sending District monthly checks in the amount of $5,000.

In December 2010, District notified Richart the health benefits it provided to her would be terminated.

C. *Current Proceedings*

1. *Complaint*

In January 2011, after receiving notice from District that her health benefits would be terminated, Richart filed a complaint against District and the three minority members of the Board. Richart alleges that under the terms of her employment contract, she had a reasonable expectation she would serve as president and superintendent of MiraCosta College through 2014. She bases this allegation on the fact that at the time she was

_____

[3]    On October 7, 2010, the trial court amended its judgment with respect to matters which are not material to District's appeal.

recruited in 2004, District asked her for a 10-year commitment; under the terms of her contract she was to receive an annual review, and if the review was satisfactory, her contract would be renewed each year for a new four-year period.

Richart alleges the defendants violated her due process rights under the United States and California Constitutions, committed a breach of contract, violated the whistleblower provisions of Labor Code section 1102.5 et seq. and Government Code section 12653, and threatened her in violation of Civil Code section 52.1.

Richart essentially asserts four theories of substantive liability: (1) in her first, second and fifth causes of action, Richart alleges that although due process and her employment contract obligated District to provide her with an annual review and continue her employment if the review was satisfactory, her employment was terminated without providing her the required annual review; (2) in her third and fourth causes of action, Richart alleges District's actions and the individual defendants' statements have stigmatized her and prevented her from obtaining any employment commensurate with her position at District; (3) in her sixth, seventh and eighth causes of action, Richart alleges she was terminated in retaliation for investigating the thefts reported to her and reporting the results of the investigation to the district attorney; and (4) in her ninth cause of action, Richart alleges she was subject to violent threats within the meaning of Civil Code section 52.1.

In addition to her substantive causes of action, Richart also alleged a cause of action for declaratory relief in which she asked the trial court to determine her obligations

10

and District's obligations with respect to the consideration each received under the terms of the invalid settlement agreement. In particular, she alleged that under the *Page* judgment she owed District $775,000, but that this amount should be offset by whatever amount the court determines District owed her in unpaid salary and benefits.

After filing the complaint, Richart also stopped making $5,000 monthly good-faith payments to District.

### 2. *District's Response*

District responded in two ways to Richart's complaint. First, by way of a levy of execution on the *Page* judgment, District attempted to collect from Richart the money it paid her under the settlement agreement. Richart objected to the levy, and the trial court sustained her objection. The trial court found the *Page* judgment it entered on remand was not a money judgment but contemplated further proceedings to determine the respective rights of the parties.

Second, District filed a motion to strike under section 425.16.[4] As we indicated, the trial court found Richart's claims against District are not within the scope of the anti-SLAPP statute because the trial court found the claims do not arise from the exercise of District's petitioning or free speech rights. Although the trial court found the statements made by the three minority Board members in 2006 and 2007 were protected activity within the meaning of section 425.16, the trial court found District's termination of employment in 2010 was not protected by the anti-SLAPP statute. District filed a timely

---

[4] The individual Board members who are named as defendants did not file a motion to strike and are not parties to this appeal.

11

notice of appeal.

## DISCUSSION

### I

The procedure governing motions to strike is well established. "'[S]ection 425.16 requires that a court engage in a two-step process when determining whether a defendant's anti-SLAPP motion should be granted. First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one "arising from" protected activity. [Citation.] If the court finds such a showing has been made, it then must consider whether the plaintiff has demonstrated a probability of prevailing on the claim.' [Citation.]" (*Episcopal Church Cases* (2009) 45 Cal.4th 467, 477, quoting *City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 76.)

The scope of actions covered by the statute is now also fairly well defined. "'[T]he mere fact that an action was filed after protected activity took place does not mean the action arose from that activity for the purposes of the anti-SLAPP statute. [Citation.] Moreover, that a cause of action arguably may have been "triggered" by protected activity does not entail that it is one arising from such. [Citation.] In the anti-SLAPP context, the critical consideration is whether the cause of action is *based on* the defendant's protected free speech or petitioning activity.'" (*Episcopal Church Cases*, *supra*, 45 Cal.4th at p. 477, quoting *Navellier v. Sletten* (2002) 29 Cal.4th 82, 89.)

In *Episcopal Church Cases*, a doctrinal dispute arose between a local Episcopal parish and the Protestant Episcopal Church in the United States of America (the national

12

church). The local parish and its members objected to the ordination by the national church of an openly gay bishop in New Hampshire and voted to disaffiliate the parish from the national church. In response, the local Episcopal diocese and the national church brought an action to recover church property from the local parish and various individuals associated with the parish. In particular, the diocese and the national church sought to recover the church building and land on which the building sits.

Among other matters, the local parish and the individuals brought an anti-SLAPP motion, which the trial court granted. The Court of Appeal reversed, and on review, the Supreme Court affirmed the Court of Appeal: "In filing this action, the Los Angeles Diocese sought to resolve a *property dispute*. The property dispute is based on the fact that both sides claim ownership of the same property. This dispute, and not any protected activity, is 'the gravamen of principal thrust' of the action. [Citation.] *The additional fact that protected activity may lurk in the background -- and may explain why the rift between the parties arose in the first place -- does not transform a property dispute into a SLAPP suit.*" (*Episcopal Church Cases*, *supra*, 45 Cal.4th at pp. 477-478, second italics added.)

In determining whether the gravamen or thrust of an action is within the scope of the statute, the trial court considers "the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (§ 425.16, subd. (b)(2); see also *Wang v. Wal-Mart Real Estate Business Trust* (2007) 153 Cal.App.4th 790, 801 (*Wang*).)

"On appeal, we review de novo the trial court's ruling on the motion to strike. [Citation.]  Whether section 425.16 applies to a particular complaint amounts to a legal question subject to this de novo standard of review.  [Citation.]"  (*Wang*, *supra*, 153 Cal.App.4th at p. 801.)

II

The principal dispute between the parties on appeal is not over the principles which govern application of motions to strike under the anti-SLAPP statute.  The parties largely agree on the applicable law.  They disagree vigorously, however, with respect as to how we should interpret the claims asserted in Richart's complaint.  Because of this dispute, and because we conclude that some of the claims are covered by the statute and some are not, we consider the causes of action set forth in the complaint separately.

A.  *Wrongful Termination Claims*

In her first, second and fifth causes of action, Richart asserts what we characterize as wrongful termination claims.  The first and second causes of action allege that under the United States and California Constitutions, Richart had a due process right to a review before her employment was terminated.  In the fifth cause of action, Richart alleges that her right to a review before her employment was terminated arises out of her employment contract, which she contends obligated District to extend her employment each year upon completion of a satisfactory review.

The gravamen of each of these claims against District is its failure to reinstate Richart to her position as president and superintendent of the college following our

14

decision in *Page* and thereafter give her the annual review called for in the renewal provisions of her employment contract. With respect to District's liability for these alleged failures in 2009 and 2010, the 2006 and 2007 free speech activities of the three individual defendants certainly were a factual predicate. In the absence of those activities, Richart would not have entered into the settlement agreement, the settlement would not have been challenged and it would not have been found invalid.

However, as in *Episcopal Church Cases*, the fact that as a historical matter free speech activities created the context for a particular dispute does not bring a cause of action within the scope of the anti-SLAPP statute. A cause of action falls within the scope of the anti-SLAPP statute only when it alleges the defendant's free speech activities are themselves actionable. (See *Episcopal Church Cases*, *supra*, 45 Cal.4th at pp. 477-478.) With respect to District's alleged liability for its failure in 2009 and 2010 to reinstate Richart and provide her with a review, Richart is not relying on District's exercise of any free speech activity. The actionable conduct—the thrust or gravamen of Richart's wrongful termination causes of action against District—is District's failure in 2009 and 2010 to perform duties allegedly required by Richart's contract and the state and federal Constitutions.

As in the trial court, District essentially argues Richart cannot pursue her theory she was terminated in 2009 or 2010. District argues the 2010 judgment invalidating its settlement with Richart did not operate to reinstate Richart as an employee and thus Richart could not have been terminated after the *Page* opinion or later *Page* judgment.

15

District argues that instead, Richart was terminated in 2007 when the free speech activities of the individual defendants made it impossible for her to fulfill her duties as president and superintendent. Because a constructive termination in 2007 caused by the minority trustees' statements would be more directly connected to free speech activities, District contends we must interpret her complaint as falling within the scope of section 425.16. We are not persuaded by this argument.

While District's view of the impact of the trial court's 2010 judgment may ultimately prevail, at this point, Richart is free to pursue her theory she was not terminated until 2009 or 2010. In this regard, we note that in December 2009, the Board adopted a resolution stating District would not renew Richart's employment contract. As Richart contends, this is evidence that in 2009 District itself believed that in the absence of the settlement agreement, Richart was still an employee. Suffice it to say, the actual date of Richart's termination is not something that we can resolve on this record. Rather, at this point, we must take Richart's allegations as she asserts them, to wit: She was terminated at some point in 2009 or 2010.

In short, Richart's allegations she was terminated in violation of her constitutional and contract rights are not subject to an anti-SLAPP motion to strike.

B. *Stigmatization Claims*

1. *Arising Out of Free Speech Activities*

In her third and fourth causes of action, Richart alleges her termination by District and the negative statements minority members made about her have stigmatized her in

16

the educational community and have made it impossible for her to find alternative employment.

In her declaration submitted in opposition to District's motion to strike, Richart stated "[t]here were a multitude of statements leading up to my termination by the MiraCosta Trustees in 2010. These have stigmatized me and when combined with the termination, have made it, so far, impossible for me to find any comparable educational positions, or even lower level educational jobs." Richart's declaration goes on to quote from 16 public statements allegedly made by the minority members of the Board criticizing her performance and conduct.

In light of Richart's own description of the factual basis of her stigmatization claims, it is clear the statements Richart relies on are not mere evidence of some other tort, but are in fact the tortious conduct which she contends gives rise to District's liability. (Cf. *Wang*, *supra*, 153 Cal.App.4th at pp. 804-805.) It is also plain the statements about Richart's performance as the administrator of a large public institution were made with respect to a matter of considerable public interest within the meaning of section 425.16, subdivision (e)(3). Thus, unlike the wrongful termination claims, Richart's stigmatization claims do arise from free speech activities within the scope of section 425.16. (See *Tuchscher Development Enterprises, Inc. v. San Diego Unified Port Dist.* (2003) 106 Cal.App.4th 1219, 1233 [statements of officials of public entity encouraging competitor to challenge existing agreement with public entity which are basis for contract actions against public entity are covered by section 425.16].)

17

Accordingly, we must consider whether in opposing the motion to strike, Richart established a probability of success on the merits of her stigmatization claims. (§ 425.16, subd. (b)(1).)

2. *Probability of Success on the Merits*

"'We decide the second step of the anti-SLAPP analysis on consideration of "the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based." [Citation.] Looking at those affidavits, "[w]e do not weigh credibility, nor do we evaluate the weight of the evidence. Instead, we accept as true all evidence favorable to the plaintiff and assess the defendant's evidence only to determine if it defeats the plaintiff's submission as a matter of law." [Citation.] [¶] That is the setting in which we determine whether plaintiff has met the required showing, a showing that is "not high." [Citation.] In the words of the Supreme Court, plaintiff needs to show only a "minimum level of legal sufficiency and triability." [Citation.] In the words of other courts, plaintiff needs to show only a case of "minimal merit." [Citations.]'

"While plaintiff's burden may not be 'high,' he must demonstrate that his claim is legally sufficient. [Citation.] And he must show that it is supported by a sufficient prima facie showing, one made with 'competent and admissible evidence.' [Citations.]" (*Hecimovich v. Encinal School Parent Teacher Organization* (2012) 203 Cal.App.4th 450, 468-469.)

Richart's declaration in opposition to the motion to strike shows that indeed she was subjected to a number of highly critical statements which questioned her character

18

and competence and which, taken together with her later termination, might have damaged her reputation. In particular, she relies on statements accusing her of threatening Board members and vandalism of a Board member's home. Richart's declaration further sets forth her unsuccessful efforts to obtain similar employment elsewhere.

Contrary to District's argument, these accusations of threats and vandalism do involve moral turpitude and thus are sufficient to support a stigmatization claim. (See *Loehr v. Ventura County Community College Dist.* (9th Cir. 1984) 743 F.2d 1310, 1317.) Thus, given Richart's minimal burden, the record shows a probability of success on the merits of the stigmatization claims sufficient to defeat District's motion.

C. *Retaliation*

In her sixth, seventh and eighth causes of action, Richart alleges she was terminated in retaliation for her role in investigating and reporting the wrongdoing that occurred in the college's horticultural department. Like her wrongful termination claims, our resolution of these causes of actions depends on when in fact Richart was terminated.

If, as Richart contends, she was terminated in 2009 and 2010, the free speech activities of the minority trustees in 2006 and 2007, while relevant in suggesting a retaliatory motive for her later termination, are no more than evidence which supports her retaliation claims and do not bring those claims within the protection provided by section 425.16. (See *Gallimore v. State Farm Fire & Casualty Ins. Co.* (2002) 102 Cal.App.4th 1388, 1399.) As we determined with respect to Richart's wrongful termination causes of

19

action, nothing in the record precludes Richart from pursuing her theory she was terminated in 2009 and 2010.  Thus, Richart's retaliation claims are not subject to section 425.16

D.  *Threats*

In her ninth cause of action, Richart alleges that following her reports to the Board and the district attorney about wrongdoing at the college, she was the victim of a death threat in violation of Civil Code section 52.1.  In support of this allegation, in her declaration in opposition to the motion to strike, Richart quoted the threat, which was sent to her office and included this statement:  "DO US ALL A FAVOR AND JUST LEAVE!  IF YOU DON'T YOU MAY NOT LIVE TO REGRET IT!  WE KNOW THE CAR YOU DRIVE.  WE KNOW WHERE YOU LIVE.  YOU ARE NOT WANTED! JUST LEAVE!"

The references to Richart's car and residence take this statement outside the realm of public hyperbole that might occur in a highly charged controversy.  Such serious and targeted threats of violence, even in a public controversy, are not protected by the free speech or petitioning provisions of the state or federal Constitutions.  (See *Siam v. Kizilbash* (2005) 130 Cal.App.4th 1563, 1570.)  Thus, Richart's Civil Code section 52.1 cause of action was not subject to an anti-SLAPP motion to strike.  (*Siam v. Kizilbash*, *supra*, at p. 1570.)

E.  *Declaratory Relief*

In her declaratory relief cause of action, Richart simply requests a determination

20

of the parties' respective rights following entry of the *Page* judgment. Nothing in that claim implicates any free speech or petitioning activities of either District or any members of the Board and thus it is not subject to section 425.16.

## DISPOSITION

The order denying District's motion to strike is affirmed. Richart to recover her costs of appeal.


BENKE, Acting P. J.

WE CONCUR:


McDONALD, J.


O'ROURKE, J.


21